State vs. Sadler et al.

---

## No. 13,053.

STATE OF LOUISIANA VS. ROBERT SADLER AND CHARLES CAMPBELL.

51 1397
d112 852
51 1397
e115 66

51 1397
120 165

### SYLLABUS.

Upon well settled principles, it would be inconsistent with the convenience and security of the public, and with due regard to the rights of one acting in an official capacity, under the color of, and a belief in, lawful authority to do so. that the validity of the acts of a judge should be disputed, or the legal effect of his appointment and qualification as codal commissioner be determined, in proceedings to which he is not a party.

This rule extends to all officers, executive or judicial, and applies alike to questions of the validity of the original election or appointment, and to questions whether the commission or authority has expired by its own limitation, or by the acceptance of an incompatible office.

An officer *de facto* is one who executes the duties of an office under some color of right. some pretence or claim of title, either by election or appointment; and the acts of an officer *de facto* are valid when they concern the public, or the rights of third persons, and can not be indirectly called in question in a suit to which such officer is not a party; and, his right can only be questioned in a suit against him.

This rule is sanctioned by the great weight of authority in England and the United States, and has been often announced and recognized by this court.

The general rule, with regard to the admissibility of dying declarations is, that the statements of deceased should have been uttered under a sense of impending dissolution. To render such declarations receivable in evidence, the deceased need not have been at the time in *articulo mortis*. It is only necessary that same should have been made under a sense of speedy dissolution, or a sense of approaching death; though it need not appear that he believed he would die immediately.

It appearing from the statement of the witness that he heard the fatal shot fired, and immediately repaired to the spot where it occurred, within the space of a few seconds, statements made to him by the deceased, constitute a part of the *res gestae.*

If a man be mistaken with regard to his actual danger, he will not be responsible for his actions, predicated upon honest convictions of danger induced by reasonable evidence.

The rule is, that he must have really and honestly believed that his life was in danger, from the character of the assault, although really not in danger; or that his person was in danger of great bodily harm, though really not in such danger; and the evidence upon which he based this belief must have been reasonable, and must have been such as would have induced such belief in a reasonable person.

The record disclosing that defendants were separately arrested on charges of murder before a city recorder, and each complaint was allotted to different sections of the Criminal District Court; and that, subsequently, an indictment was found by the grand jury against both of the defendants, jointly charging them with the murder of the deceased, and the case was allotted to one section of the court, the defendants' objection that the cause was illegally allotted thereto, is without foundation, for the reason that the finding of the indictment necessarily abated and merged the aforesaid preliminary proceedings into the cause or prosecution, and no further action thereupon could be entertained.

### ON REHEARING.

1. A statement made shortly after a murderous assault by the wounded man, believing he would die as the result of his wounds and so announcing at the time, is receivable in evidence as a dying declaration.

2. But another statement made by him twenty-four hours later, not shown to have been made under the sense of impending dissolution and when he did not again affirm his belief that he was about to die, or would die soon as the result of his wounds, is not admissible in evidence.

3. It may well be that the deceased, at the time of the second interview, did not believe he was about to die, and the statement could only be received upon the hypothesis that it was a dying declaration, unless it were part of the *res gestae*, which cannot be claimed for it.

ON APPEAL from the Criminal District Court for the Parish of Orleans. *Moise, J.*

*M. J. Cunningham,* Attorney General, *Robert H. Marr,* District

Attorney, and *Joseph E. Generelly,* Assistant District Attorney, for Plaintiff and Appellee.

*Louis P. Paquet* for Defendant and Appellant.

Argued and submitted February 25, 1899.
Opinion handed down April 17, 1899.
Rehearing granted June 29, 1899.
Decree reversed June 29, 1899.

On rehearing by BLANCHARD, J.

The opinion of the court was delivered by

WATKINS, J.   The two defendants were jointly indicted for the murder of one Peter Miller, and on the trial the jury returned a verdict against Robert Sadler of "guilty as charged," and against Charles Campbell of "guilty without capital punishment."

Thereupon, the trial judge sentenced Robert Sadler to the extreme penalty of the law, and Charles Campbell to hard labor in the penitentiary for the term of his natural life; and from that sentence and judgment, both defendants prosecute this appeal.

In the course of the trial, quite a number of bills of exceptions were reserved to rulings of the trial judge, and all of which are insisted upon here; the most important and conspicuous of which is, that which relates to the capacity, or rather the competency of the trial judge, to preside over the deliberations and proceedings in the aforesaid cause.

That bill of exceptions bears the serial number 23, but, on account of its character and importance, we will dispose of it first.

I.

The bill of exceptions, in substance, relates, that on the 10th of December, 1898, subsequent to the filing of defendants' motion for a new trial, and before same had been called for trial, they had offered and filed an objection and plea to the effect, that the Hon. James C. Moise, the presiding judge of the court, had accepted a position upon the commission designated by the Governor to frame a Criminal Code of Law, Procedure and Correction, under and in pursuance of

the Constitution of 1898, and had entered upon the discharge of the duties thereof, and had commenced the labor incident thereto.

That by such acceptance of said office, and undertaking the performance of the duties thereof, he vacated his office as judge of Section "B" of the Criminal District Court, and is, therefore, without power or authority to act as such, or competent to discharge and perform the duties thereof; and that such disqualification renders him incapacitated to hear and determine their motion for a new trial.

The fact of the appointment of the trial judge to the aforesaid position, and his acceptance thereof, is admitted on the part of the State, but the disqualifying effect of said appointment and acceptance, is denied.

Said motion was entertained by the trial judge, but on the trial thereof, he decided that the plea was not well grounded, because said designation, or appointment, was not made to an office within the meaning and intendment of the Constitution prescribing that term.

The reasons he assigns for his ruling, are as follows, viz.:

"*First:* It is not necessary, as it is not an office.

"*Second:* Because, if it should be held to be an office, he did not " wish to hazard the validity of his official acts by qualifying for " another office, (?) even though such acts might be held to be valid, " as having been performed by a *de facto* officer.

"*Third:* He declined to qualify for the commissionership under any " circumstances; for, should it be held to be an office, he does not wish " to vacate the judicial position which he now has the honor of hold- " ing."

There is no question as to the legallity or validity of the title of the trial judge to the judicial office he holds; that is to say up to the date of his recent appointment as codal commissioner. He was, at the time, judge *de facto* and *de jure;* a constitutional officer, possessed of unquestionable muniments and *indicia* of office.

Of that primordial title this court will take judicial cognizance; and it is otherwise fully attested by its own reports which deal with numerous cases that were appealed from his court.

But defendants' counsel invoke the prohibition of the Constitution, to the effect that "no person shall hold or exercise more than " one office of trust or profit," (Article 170), and contend that the holding or exercising of a second office, that of codal commissioner,

*ipso facto* vacates the office of judge, and renders the incumbent incapable of exercising the functions thereof.

As an illustration of the position they assume, we quote the following from their brief, viz.:

"Acceptance of a second office, incompatible with the first, vacates " first office. It is a well settled rule of the common law, that he who, " while occupying one office, accepts another incompatible with the " first, *ipso facto*, absolutely vacates the first office, and his title is " thereby terminated without any other act or proceding. That the " second office is inferior to the first, does not affect the rule. And, " even though the title to the second office fail, as where the election " was void, the rule is still the same, nor can an officer, then, regain " possession of his former office to which another person has been ap- " pointed or elected." Mechem, on Public Officers, Sec. 420.

But the preliminary question which underlies this argument is the right of a defendant, in a criminal proceeding, to create this issue as appertaining to a judge, who, possessing an undoubted title to his office, is entitled to the protection which the law accords a *de facto* officer, until his title thereto is annulled in a direct action at law, by a competent court.

Counsel cite several adjudications of this court, wherein the principle is announced, that a jury commissioner vacated his office, and became, thereafter, incompetent to perform the duties and functions of that office, by accepting the office of police commissioner, or *vice versa*. State vs. Newhouse, 29th Ann., 824; State vs. Arata, 32nd Ann., 193; State vs. Dellwood, 33rd Ann., 1229; State vs. Beaird, 34th Ann., 106; State vs. Nockum, 41st Ann., 692.

But an examination of those decisions will show that the court dealt with ministerial officers, whose duties were immediately and alone connected with the drawing of grand juries, and with the regularity of whose proceedings, and the validity of whose acts, parties indicted were directly interested.

The objections there urged, went to the competency of the grand juries to find and return indictments into court, and which findings constituted the foundation of the prosecutions against the parties complaining of them.

In criminal cases the judge is the presiding officer of the court, whose duties are limited to a supervision of the trial—the determination of which is exclusively the province of the juries; and even in the

disposition of motions for new trial, the judge's finding consists merely in the summing up of testimony adduced on the trial of the motion, and a comparison of same with the testimony adduced before the juries.

Upon an investigation of the authorities, we find that the prevailing rule is therein recognized to be that the rights and powers of an officer can only be enquired into by suit, to which he is a party, and that one exercising the duties of an office, to which he originally had an unquestioned title, can not be successfully attacked collaterally.

An officer *de facto* is one who exercises the duties of an office under color of appointment, or election to that office, or who has the reputation of being the officer he assumes to be. He differs on the one hand from a mere usurper of an office who undertakes to act as an officer without color or right, and on the other, from an officer *de jure* who is, in all respects, legally appointed and qualified to exercise the office. The rights and powers of a judge *de facto* can only be enquired into by a suit to which he is a party; that is to say by *quo warranto,* at the suit of the State.

In Thomas Sheenan's Case, 122 Mass., 445, the court, speaking through Mr. Justice Gray as its organ, held that a judge of the court of the commonwealth of Massachusetts, who had been elected to, and had taken a seat in the Legislature, continues publicly to exercise his judicial office; the question whether he is qualified to act as judge, under the Constitution, can not be determined upon a writ of *habeas corpus* sued out by a person whom he has tried and sentenced to imprisonment.

"The petitioner," says the court, "not denying the jurisdiction of " the police court of Lynn, rests his claim to be discharged upon the " disqualification of Mr. Hawkes, (who as a special justice of that " court, passed the sentence and ordered the committment,) by reason " of the eighth article of amendment of the Constitution, which de- " clares that no judge of any court of this commonwealth * * * " shall, at the same time, have a seat in the Senate or House of Rep- " resentatives.

"But if Mr. Hawkes, upon taking his seat in the House of Repre- " sentatives, ceased to be a justice *de jure,* he was by color of the " commission which he still assumed to hold and act under, having " the usual signs of judicial office—sitting in the court, using its seal, " and attended by its clerk—and no other person having been ap-

" pointed in his stead, a justice *de facto.* Upon well settled princi-
" ples, it would be inconsistent with the convenience and security of
" the public, and with a due regard to the rights of one acting in an
" official capacity under the color of, and a belief in, lawful authority
" to do so, that the validity of his acts as a justice should be disputed,.
" or the legal effect of his election and qualification as a representa-
" tive be determined, in this proceeding to which he is not a party.

\*        \*        \*        \*        \*        \*        \*        \*-

"The rule extends to all officers, executive or judicial, and applies-
" alike to questions of the validity of the original election or appoint-
" ment, and to questions whether the commission or authority has-
" expired by its own limitation, or by the acceptance of an incom-
" patible office."

In Cocke vs. Halsey, 16 Peters, 71, the Supreme Court expressed a
decided opinion, "that assuming that the appointment (of a clerk)
" was by the Constitution and laws of the State limited to the term,.
" yet he was clerk *de facto,* acting *colore officii,* and his acts must,.
" therefore, be deemed valid, as regarded third persons interested in
" them.

"So, acts done by a justice of the peace, or a constable, after his
" commission has expired, but while he is commonly reputed to hold
" his office, are valid."

In Brown vs. Lunt, 37 Maine, 423, the rights of a *de facto* officer
were very fully considered and tested by the authorities, English and
American, and, in the course of their opinion, the court said:

"The distinction between officers *de facto,* acting *colore officii,* and
" officers *de jure,* has been recognized in England from an early
" period, and seems to have been applied to officers of every grade, from
" the king to the lowest incumbent of office"—citing numerous cases.

"Without further reference to cases," say the court, "it will be
" found that the distinction stated is fully sustained by those already
" cited; and that it applies to all public officers, judicial or minis-
" terial, whether claiming by election or appointment; and whether
" holding under a defective title, within the term, or in possession,
" and exercising the office under color of right, beyond the term affixed
" to it by law."

In McGregor vs. Balch, 14 Vermont, 428, it was held, that if a
justice of the peace exercise the office at the same time he holds the
office of postmaster, he may be removed on a *quo warranto,* and it

seems that, in a suit against him for acting as justice, he could not justify under his appointment as justice. But that such person is a justice *de facto,* and all his acts as such are valid between third persons; and that in a suit to which he is not a party, neither his appointment nor elegibility can be tried or determined.

In Hooper vs. Goodwin, 48th Maine, 79, the court said:

"An officer *de facto* is one who executes the duties of an office under " some color of right, some pretence of title, either by election or ap-" pointment. The acts of an officer *de facto* are valid when they con-" cern the public, or the rights of third persons, and can not be in-" directly called in question in a suit to which such officer is *not* a " party. His right can only be questioned in a suit against him. A " mere usurper is one who acts without color of title, and whose acts " are utterly void."

Tucker vs. Aiken, 7 N. H., 113; People vs. Collins, 5 Johns, 549.

"In the present case, Edgerly was commissioned and qualified to " act as a justice of the peace. Whether the appointment was legal or " not can not be called in question in a suit between these parties. He " is an officer *de facto,* acting under color of an appointment in due " form of law, and if on account of his alleged minority it was illegal, " the invalidity of the appointment, or the personal incapacity of the " appointee, can only be determined in a suit in which he can contest " these questions. His official acts are valid as to third persons, till " his commission has been judicially determined to be null and void.

"Such, too, was the rule of the Roman law even when the appoint-" ment was of a slave."

In Hamlin vs. Kassafer, 15 Oregon, 456, it was held: "It may be " said, then, that the color of right which constitutes one an officer *de* " *facto,* may consist in an election or appointment, or in holding over " after the expiration of one's term, or acquiescence by the public in " the acts of such officer for such a length of time as to raise the pre-" sumption of colorable right by election or appointment.

"From considerations of public policy, the law recognizes the official " acts of such officers as lawful, to a certain extent. It will not allow " them to be questioned collaterally, and they are valid as to the " public, and as to third persons who have an interest in the thing " done."

In Leach vs. Cassidy, 23rd Ind., 449, the court say: "The law has " provided abundant means by which an officer *de jure* may become

" such *de facto,* against another person who wrongfully holds poses-
" sion; but the public are interested while such litigation is pending
" to settle the right, that the functions of the office shall continue to be
" exercised in order that the public business may be done.

"To this end it is a rule of plain common sense, as well as of law,
" that an officer *de facto* shall act until he shall be ousted."

In State vs. Durkee, 12·Kansas, 314, the court say:

"The interest of the public requires that somebody should exercise
" the duties and functions of the various offices pending a litigation
" concerning them, and no one has a better right to do so than the
" various officers *de facto* who claim to be officers *de jure*."

In Carli vs. Rhener, 27th Minnesota, 293, it appears that one Smith,
·who had been elected judge, qualified, and thus under a state of facts
given became *de jure* a judge in the face of his predecessor whose
term had expired. Thereafter on the same day, before Smith began
to perform the duties of an officer, N— directed judgment in an
action he had tried. *Held:* That his acts in doing so were those of an
officer *de facto,* and were valid.

In Petersilea vs. Stone, 119 Mass., 465, the court said:

"The reason of public policy, upon which it is held that the acts of
" an officer *de facto* are not to be called in question collaterally, but
" are valid as to third persons, may apply even to the case where such
" an officer is a usurper and intruder. This principle has been applied
" in England to the most important office.

\*         \*         \*         \*         \*         \*         '\*         \*

"Third persons, from the nature of the case, can not always inves-
" tigate the right of one assuming to hold an important office, even so
" far as to see that he has color of title to it by virtue of some appoint-
" ment or election. If they see him publicly exercising its authority,
" if they ascertain that this is generally acquiesced in, they are enti-
" tled to treat him as such officer, and if they employ him as such,
" should not be subjected to the danger of having his acts collaterally
" called in question."

In McGregor vs. Balch, *supra,* we find this appropriate statement:

"It is said that these defendants have presented the question as
" soon as their rights were invaded by the acts of this justice. This is
" true if they have the right which they contend for. But if Morrill
" was a justice, duly appointed, and acted as such, the plaintiff might
" well bring this suit before him, not knowing of his holding an office

State vs. Sadler et al.

"incompatible with the office of justice, which he exercised, and there
"would be no more propriety in saying the suit should fail on that
"account because the defendant in this suit brought his appointment
"in question, than in saying the reverse.  There was nothing particu-
"larly affecting the interest of this defendant in being sued before
"this justice, nor should he be permitted to inquire whether Morrill
"rightfully held the office in any suit to which the justice was not a
"party.

"If this suit should be abated or dismissed on account of the ob-
"jections raised against the justice, it will follow, as a necessary
"result, and one which can not be avoided, that every act of a judi-
"cial officer similarly situated is void.  The taking confessions of
"debt, acknowledgements of deeds, or solemnizing matrimony, or any
"and every act of that nature, are invalid and void, unless they are
"recognized as the acts of an officer *de facto*."

The decisions of this court are in keeping with the principles an-
nounced in the foregoing decisions of the courts of other States.

In Canal and Banking Company vs. Tanner, 26th Ann., 278, it was
held by this court that a "person in possession of the office, and acting
"as clerk, and who had caused process to be issued, was a *de facto*
"officer, and his official acts were valid, however indifferent his title to
"the office might be."

In Citizens' Bank vs. Bry, 3rd Ann., 630, the court said:

"And even if he had not taken the oath prescribed by the statute,
"and if we are to regard him, as counsel seems to insist, in the light
"of a public officer, the objection is repelled by the well settled rule
"that, the acts of an officer *de facto,* thus having color of title in the
"exercise of the ordinary functions, protect those who may be inter-
"ested in such acts."

In State vs. Gilbert, 10th Ann., 524, the defendant having been
indicted upon a charge of murder, and having been admitted to bail,
the district attorney sought to have his bond forfeited, and the sure-
ties resisted, upon the ground that the sheriff, by whom the accused
was arrested, and who had taken the bond, was disqualified to act as
such officer; and thereupon, the court said:

"There is no weight in the position that Dinkgrave was not sheriff
*de jure*.  Conceding that he was not, it is shown that he was the
sheriff, and the only sheriff *de facto* under color of title, and his

official acts as such are not absolute nullities, but must be held good in controversies between third persons."

In Case vs. Whitworth, 13th Ann., 401, Mr. Justice Spofford, in a concurring opinion, said:

"He is an officer of the State *de facto,* acting under color of legal " authority, and he is not a party to this suit. To declare his action " null and void, by a side-long judgment in a suit between third per- " sons, would be contrary to reason as well as to precedent."

To the same effect is Maihle vs. Fournet, 13th Ann., 607.

In State vs. Lewis, 22nd Ann., 33, the court said:

"It appears that N. J. Scott performs the duties of an office of " parish judge of the parish of Claiborne. His capacity and right to " perform these duties can not be enquired into collaterally. What- " ever functions or powers district judges are vested with, under the " Intrusion Act, parish judges may exercise *pro hac vice,* when acting " in place of the district judge, recused."

There are several cases in which the doctrine opposed to the fore-going decisions was apparently entertained, but a reference thereto will disclose that such is not the fact.

In State vs. McFarland, 25th Ann., 547, the defendant was indicted for murder, and was admitted to bail, and the sureties filed a motion to set aside the judgment *nisi* upon the ground, amongst others, that no legal warrant had issued against him; that he had not been legally arrested, and that the bond had not been taken by one legally author-ized to take and approve the same, and it was, therefore, null and void. That the law prohibits all officers from recognizing, in any manner, usurpers in office, and that the clerk and sheriff of said court are usurpers of their offices—pretending to act without authority of election, duly declared, and without commissions from the Governor of the State.

Thereupon, the court said:

"It is evident that, if the allegations made in the motion be true, the motion should have been maintained, as there can be no judicial proceedings in the District Court, without clerk and sheriff, and the allegations substantially amount to this, that, practically, the District Court of Caddo parish had neither of those officers (clerk or sheriff) acting when the proceedings in this case were had."

And, after citing the facts applicable to the defendants, the court made the following statement:

"It is manifest, from the foregoing statement of facts, that S. M. Morrison and J. W. Pickens are pretending to hold their offices, and to exercise the functions thereof, under what they call 'the McEnery government,' in opposition to the authority of the United States, and the laws and decisions of the courts of this State.

"It would seem to be absurd to require an argument to show that " parties occupying such positions can not be regarded as *de facto* " officers of the government, whose authority they condemn."

In State vs. Phillips, 27th Ann., 663, the defendant was charged with, and convicted, of the crime of perjury, and in this court made an assignment of errors, one of which is to the effect, that "the trial and sentence" was *coram non judice* in this, that George Braughn, Esq., an attorney at law, had no legal right to act as judge in the trial of the accused, and pass sentence on him; that the order appointing said George H. Braughn, as judge of the Superior Criminal Court, is null and void.

"Section 10 of Act 124, of 1874, under the authority of which said order so appointing said George H. Braughn, as judge, aforesaid, was made, is unconstitutional and obnoxious to Articles 83, 90 and 94 of the Constitution of the State."

To this assignment, by the defendant, the State insisted "that Mr. Braughn was a *de facto* judge, and that his right to hold the office can not be questioned collaterally. That if the court, from an examination of the record, find that Braughn was a *de facto* officer, when he tried the case, the validity of his acts will not be questioned.

\*        \*        \*        \*        \*        \*        \*        \*

"Whether the appointment of Braughn as judge of said court was or was not legal, can only be considered in a suit properly instituted, having for its object his vacation of the office into which he has intruded, or which he has usurped, or which, from any cause   he illegally holds."

In support of this proposition, the attorney general cited various authorities, some of which we have already quoted. But the court made the following reply:

"The proposition that a *de facto* officer's right to the office held by " him can not be attacked collaterally, is unquestionable. But the " error in this argument is in assuming that Mr. Braughn was a *de* " *facto* officer. Mr. Braughn did not pretend to hold the office of " judge of the Superior Criminal Court, but, on the contrary, he

"recognized the right of Judge Atocha to said. office, and he only "claimed to exercise the functions of that office under a delegation. "of power from Judge Atocha.

"The right of Judge Atocha to said office was never disputed by "Mr. Braughn, and his right to preside in that court would have been "acknowledged by Mr. Braughn, and the people, any day during all "the time Mr. Braughn acted under the said delegation of authority. "Therefore, the question about the validity of a *de facto* officer's acts "can not arise in this case."

In State vs. Fritz, 27th Ann., 689, the defendant was convicted of perjury, and in this court filed an assignment of errors, the most important objection being that he had been tried before George H. Braughn, an attorney at law, who presided under the appointment of Judge Atocha, the judge of said court—the defendant's complaint being similar to that made in the Phillips case. The court, in its opinion, says:

"As to the position that George H. Braughn was a *de facto* judge, "and, therefore, his official acts were valid, we will remark that he "had no color of title to the office of judge of the Superior Criminal "Court, held no commission from the Governor, and set up no adverse "title to the office. Indeed, he never claimed or pretended to be judge "of that court. He recognized Judge Atocha as the judge of the "court, and with his authorization attempted to perform the duties "of that officer during his inability to act on account of sickness.

"The sole question, therefore, in the case, is a question of authority "of a judge to appoint an attorney to perform his official duties dur- "ing his sickness, in view of the clause of the Constitution quoted. "And this question, we think, we have disposed of in the observations "already made."

It is sufficient for us to say that, in the three cases foregoing, it was held that the officers, of whose capacity complaints were made, did not exhibit titles sufficient to justify the claim that they were *de facto* officers, but, that, on the contrary, they were, in point of fact, mere usurpers, wholly without authority.

In this opinion we are confirmed, if confirmation were necessary, by the decision of this court in Guilbeau vs. Cormier, 32 Ann., 930, in which the court said:

"The plaintiff urged that the enquiry into the qualification of the "judge *ad hoc* comes too late, after judgment, and that the objection,

"for want of capacity or illegality of the judge *ad hoc,* should have "been urged before going to trial.

"It is a well settled rule of jurisprudence that acts performed by *de "facto* officers have binding effect when the power of appointing, or "the act of appointment was not in violation of the Constitution or "laws of the State.

"The district judge had the unquestioned power to appoint a judge "*ad hoc* to try the cause, and his error consisted in selecting an attor-"ney who did not possess *all* the qualifications presented by the Con-"stitution. Does it follow that the acts performed by the appointee "are absolutely null?

"Public policy has dictated a different ruling, which has been "uniformly adopted by our courts. * * * In the case of Braughn, "27 Ann., 663, this court held that the judge of the Superior Crim-"inal Court had no authority in law to appoint any one without ref-"erence to his personal, professional, or specific qualifications, as "judge *ad hoc* of his court, during his illness or absence, and that the "appointment having been made in violation of the Constitution, it "was absolutely null and void, and could have no legal effect.

"The qualifications of the appointee were not at issue in that case, "but the question turned upon the very foundation or essence of the "right to appoint in the premises.

"In this case the issue is exclusively as to the qualifications of the "appointee, who, in this light, stands in the attitude of a party "elected, or appointed, as district judge, who should lack some of the "essential qualifications for the office, but whose acts are binding "until his inelegibility is judicially ascertained, and the office "declared vacant, according to law."

Having made a full examination of all the authorities having application to the subject, we have reached the conclusion that the trial Judge possesses, at least, the *status of* a judge *de facto*—even if it be conceded that his title *de jure* is in any respect questionable. But this question we do not feel called upon to decide; and we hold that it is not a question which it is competent for this court to decide in the present litigation.

For these reasons, the exception of the defendants to the capacity of the trial judge to hear and determine the motion for new trial can not be maintained, and the ruling of the trial judge on the question will not be disturbed.

## II.

Bills of exception one, two and three, relate to the admission in evidence of certain statements of the deceased as his dying declarations, and the objections of defendants thereto.

The following is quoted from the brief of their counsel, viz.:

### BILLS 1, 2 AND 3.

"These bills were taken to the admission of a pretended dying declaration, or conversation, had with the deceased by Police Captain, John Journee, on the night of the shooting, to-wit—the 31st of December, 1897, three days before his death. The objection to this conversation was that it was not made under a sense of pending dissolution, and that the deceased did not believe he was about to die at the time. The only testimony offered in any way to show this, was the testimony of *policemen,* who testify that the deceased said: "'Journee, I am gone.' Overcoming this weakest kind of evidence, the same policemen have two other interviews with the deceased, and at no time does he show any fear or sense of pending death. There were no surroundings which justified the admission." P. 23.

As the three objections having been stated in one bill, they may be thus epitomized, viz.:

That on the trial, and during the time when Police Captain, John Journee, was testifying on behalf of the State, "and was about to state "a conversation with the deceased on the night of December 31st, "1897, three days before his death," objection was made by defendants' counsel, "because the deceased was not dying at the time of the "said conversation, and had only told the aforesaid witness, 'Journee, "I am gone'; and that such a statement alone was not sufficient evidence to show that the deceased intended to make a dying declaration, or made the statement he did to Captain Journee * * * "under a sense of pending dissolution," and, consequently, the statement made by the deceased, to the witness, was inadmissable as a dying declaration. That, on the contrary, the statement of the officer proved, most conclusively that the deceased was not, at the time of making it, *in articulo mortis,* as he only died three days subsequently, and that he had intermediately held several conversations with the deceased, and did not believe that he was going to die when the deceased made that statement."

The trial judge made the following assignment of his reasons for admitting the statement of the deceased, viz.:

"The statement, 'Journee, I am gone,' and the surroundings at the " time, justified the admission of the subsequent statement, immedi- " ately made, as a dying declaration. The wounded man was on a cot " in the Charity Hospital, unable to raise himself up. * * * * *

"He was shot at short range, a distance of about ten feet, and was " wounded in a vital spot, just below the right nipple. The bullet was " not removed. The character of the wound, the manner of its inflic- " tion, and its effects, were calculated to justify the apprehension of " death in Miller's mind, and the sense of this well founded appre- " hension found expression in the simple statement confirming it, " 'Journee, I am gone.'

"He was guilty of no irreverence, anger, or vindictiveness. There " was nothing to show he had any doubt as to his approaching death."

The authorities applicable to this state of facts, support the ruling of the trial judge.

The general rule is thus stated, viz.:

"The declarant, to render his declarations admissable, must have " uttered them under the sense of impending dissolution, and with a " consciousness of the awful occasion, though the principal is not " affected by the fact that death did not ensue until a considerable " time after the declarations were made," etc.

Wharton's Crim. Ev., Sec. 261.

"But it is not necessary to prove expressions implying apprehension " of immediate danger, if it be clear that the party does not expect to " survive the injury, which may be collected from the general circum- " stances of his condition," etc.

*Ibid.* Sec. 282.

The foregoing precepts found appropriate expressions in the reasons that were assigned by the judge.

In State vs. Daniel, 31st Ann., 91, the statement of the court is:

"Shortly after he had been wounded, the deceased said: 'I am " dying.' 'Be quiet,' he was told, 'and you will get well.' He repeated: " 'I am dying; I will not get well,' " etc.

Upon this statement the court observed, "that it matters little that, " after making this declaration, the wounded party survived several " days;" and the court held that the evident apprehension on the mind

of the deceased of impending death was sufficiently clear. to justify the admission of his statement as a dying declaration.

In State vs. Keenan, 38th Ann., 660, the declaration made by the deceased was "that he had given up, and thought he was a case, or that he was gone up." Of this statement, the court said:

"We do not conceive it to have been necessary that the deceased " should have said that he believed he would die *immediately*, but " regard it sufficient, if the facts detailed were such as to indicate that " the deceased was conscious at the time of making his declarations of " his *approaching dissolution*.

"To render such declarations receivable in evidence, the deceased " need not have been at the time *in articulo mortis*. It was only " necessary that same should have been made under a sense of " *impending* dissolution, which soon thereafter occurred.

"To this sense of approaching death, the law attaches the solemnity " of an oath, and impresses upon a statement made under it, the " character of evidence."

The following cases are likewise pertinent, viz.: State vs. Spencer, 30th Ann., 362; State vs. Trivas, 32nd Ann., 1086; State vs. Molisse, 36th Ann., 920; State vs. Newhouse, 39th Ann., 862.

In our opinion the ruling complained of was correct, and the testimony properly admitted.

## III.

Bill number four relates, particularly, to a statement that the deceased made to the same police officer, the substance of which was, that the deceased identified the defendants as the parties who were guilty of the homicidal attack upon him.

The two defendants being under arrest, and brought into the presence of the accused, the following statement was made by the deceased, viz.:

"That is the man Chapman; your name is not Sadler, but Chapman. You are the man who shot me." Again: "You, Campbell, had "a pistol in your hand also."

The objections to this statement are, (1) That the evidence was not admissible as a dying declaration; (2) or as part of the *res, gestae;* (3) that the defendants were under arrest at the time; (4) that the tendency of the statement of the deceased was to corroborate the statements of other witnesses of the State, and to contradict those of the defendants.

It is evident that all of the foregoing objections must be governed and controlled by the ruling made on the bills of exception one, two and three, to the effect that the conversation had and held between the deceased and the police officer was admissible as the dying declarations of the deceased, and his statements competent testimony; for, being admissible as testimony, it must be given full effect—entirely irrespective of whose testimony it may confirm or contradict.

The observations made with regard to the first three bills of exception are, equally, applicable to this one.

## IV.

The bill of exceptions number five relates to the admission in evidence, over defendants' objection, of the testimony of certain other witnesses for the purpose of corroborating that of the police officer John Journee—the testimony objected to being incorporated therein.

This objection relates to the same subject matter as that contained in previous bills, and is covered by same ruling.

## V.

Bill number six relates to an alleged unfairness in the examination, on the part of the State, of a little negro boy, by propounding to him leading questions.

The judge states that defendants' counsel did not object, during the progress of the trial, to the questions propounded as being leading and suggestive of the answers sought; and, therefore, no bill of exceptions was reserved on that account.

But, he says, after the testimony was all in, *the questions were repeated,* and counsel then urged his objections.

We are of opinion that this course of dealing with the testimony was irregular. It had been offered and admitted without objection on behalf of the defendant. If the questions were leading or suggestive, the defendants' counsel had an opportunity to make their objections seasonably. But, having failed to make timely objection to that kind of interrogation, and the testimony having gone to the jury. the trial judge was evidently without power to subsequently qualify or limit the effect to be given thereto.

## VI.

. Bill of exceptions number seven relates to a remark that the district attorney made to the defendants' counsel while the aforesaid little negro was under cross-examination, viz.:

"You are trying to take advantage of an ignorant negro on the stand."

To which remark, counsel objected as being prejudicial to the accused, and made complaint to the court; and that the trial judge observed that he "did not see any objection to that."

The judge assigns that "the remark of the court was made after the question had been read; and it had not been heard at the time."

He further states, that the accused could not have been prejudiced by the remark. "If he had been," says the judge, "counsel should "have requested the court to charge the jury specially upon the point."

This counsel did not do.

We can not believe that such a remark could have exercised any prejudicial influence upon the minds of the jury; on the contrary, the legitimate inference to be drawn therefrom would seem to be that, the district attorney was distrustful of his own witness.

## VII.

Bill of exceptions number eight relates to the admission in evidence on behalf of the State of a transcript from the First Recorder's Court, which purports to contain the testimony of one J. S. Field, who is reported to be dead, and which was read to the jury over the defendants' objection.

In the bill it is stated that objection was urged to the certificate, on the ground that the document was neither certified to, nor signed, according to law—the certificate being incorporated therein.

The trial judge states in his assignment of reasons, that the recitals in the bill are incorrect.

"No objections," says the judge, "were made to the signature of "the recorder. Had objections been made, Recorder Finnegan, whose "court-room is down-stairs, in the same building, could have been sent "for, and his signature proven.

"Besides, counsel admitted the genuineness of the signature, and "correctness of the certificate, by attempting to impeach the testi- "mony of the witnesses"—enumerating them.

The testimony of said witnesses is annexed to, and made a part of the bill.

Following the unvarying rule in such situation, we feel bound to accept the statement of facts made by the judge, and that, necessarily, results in affirming the correctness of his ruling.

## VIII.

Bill of exception number ten, relates to the admission in evidence of a similar deposition of one Ed. McCarthy, who was reported to have been absent from the State permanently, and residing in the State of Missouri, at the time of the trial, and, therefore, beyond the reach of the process of the court; the objection being (1), that, the testimony failed to disclose that the person described was the same man; (2), that said witness had been duly subpoened, and summoned according to law, at his domicile in the City of New Orleans; (3), that the said depositions were not properly proven or authenticated; and, (4), that the certificate of the recorder was not properly certified, according to law—the testimony of the witnesses being thereto annexed.

An examination of the testimony satisfies us, that the identity of the witness McCarthy is reasonably well established; and that, while residing in New Orleans, he enlisted in the United States army, and was assigned to the engineer corps, and sent to St. Louis, where he now is with his command.

The parol testimony further shows, in addition to the recitals of the record in question, that McCarthy was regularly and legally summoned, and personally served in St. Louis, Missouri.

This subserves all of the reasonable requirements of the law, requiring a basis to be laid for the introduction of secondary evidence.

## IX.

Bill number eleven relates to the admissibility of the testimony of a State's witness, Alice Welsh, the statement thereof being, that when she reached the deceased, Miller, she found McCarthy and King by his side; and, that, at the time of the shooting, "she was at least one block away, and out of the hearing of the deceased, and that five minutes had elapsed" after the shooting occurred.

The trial judge, in his assignment of reasons, says:

"(1) The remark made by the court at the time the witness made her estimate of time by the clapping of hands is not included in the statement above. The court found it was nine seconds from the time the first shot was fired, to the time the witness reached Miller's side. She ran a distance of about twenty-five feet.

"The evidence was clearly a part of the *res gestae*."

"(2)  The testimony was, that Miller told the witness he was shot, " and that Sadler was the man who shot him."

The witness, Alice Welsh, testified, that she was inside of her room when she heard three shots fired, and that she stepped to the door and looked out, and saw Miller, "standing at the corner of Gasquet and " Villere (streets), and he was reeling like a man drunk.  I asked " him what was the matter, (and) he said he was shot, etc."

"Q.—How long after the shooting was this?

"A.—The shots weren't hardly fired."

She stated, that she went immediately to the wounded man, and he then made the declaration that Sadler was the man who shot him.

She did not actually see the participants at the time the shots were fired, but she heard the three shots fired.  She saw the wounded man staggering like a drunken man; and saw the two defendants hastily retreating from the vicinity of the wounded man.  That she ran from her house to the wounded man, the distance being only about twenty-five feet.

The witness was interrogated at length with regard to the length of time which intervened between the firing of the shots, and her arrival at the place of the homicidal assault; but she could make no satisfactory estimate of it.  At length the suggestion was made by the district attorney that he would clap his hands, and that she, witness, would stop him at the proper time.

The idea was adopted, but the testimony fails to show the length of time this process occupied; but, the judge found it to have been only nine seconds.

There is nothing in the evidence to contradict this statement.

In our opinion, the statements made by the wounded man to the witness were properly admitted as part of the *res gestae*.  The sound of the shots that were fired, the staggering and fall of the wounded man, the hasty retreat of the two defendants from the place of the assault, the hurried approach thereto of the witness, and the immediate declaration of the wounded man to the witness that the defendant, Sadler, shot him, are parts and parcels of one transaction; and that transaction speaks for itself.

They constitute the *res gestae*, and the statement of the deceased was properly admitted in evidence.

## X.

Bill of exceptions number twelve, relates to the refusal of the court

to permit the defendants' counsel to introduce in evidence the statements of witnesses, relative to conversations they had held with the defendants on the night of the homicidal assault, and only an hour or two before the same occurred; and, also, certain statements that the deceased had made about the same time, all with the view and purpose of supporting the defendants' theory of self-defense, or, in the alternative, of reducing the crime to the grade of manslaughter.

The following is one of the recitals of the bills, viz:

"The said evidence sought to be offered by the defendants by this "witness, would show the nature of the interview between her, Sadler "and Campbell, immediately before the shooting, to fully prove there "was no design or premeditation on the part of either defendants, "etc."

On this question, the judge makes the following assignment, viz.:

"The conversation sought to be introduced in evidence took place "at least a half or three-quarters of an hour before the killing, a "period of time more than sufficient for any man to recover from his "first impulse of passion, if any existed.

"Besides, the defendants sought Miller; and their conduct through-"out the unfortunate affair exhibited great coolness and delibera-"tion."

We think it quite clear, that this conversation constituted no part of the *res gestae*, for the reason, that, according to the statement of the defendants' counsel, it was offered upon an entirely different hypothesis, that of showing the *absence* of any malice on the part of the accused. It was hearsay testimony and incompetent. What they did, or said, at the time specified, if admissible evidence under any circumstances, could have been related by the defendants themselves as witnesses; and what the deceased said or did, to bring about the fatal difficulty, was not admissible in evidence, in presence of the proof that the defendants made the assault on him from which his death ensued.

We are of opinion that the motives of the assailants can not be eked out in this way; that is by proof of the statements of the participants in a homicide, an hour or more before it occurred, with a view of diminishing the gravity of a subsequent assault.

## XI

Bills thirteen and fourteen are predicted on a similar state of

State vs. Sadler et al.

facts, are argued in the brief of defendants' counsel, under one head-- ing, and are necessarily controlled by the conclusions announced, with· regard to bill number twelve.

## XII

Bill of exceptions number fifteen relates to the introduction on the· part of the State, in rebuttal, of testimony tending to show that the wounded man was unarmed when he was first found and conveyed to the hospital, for the purpose of supporting the theory that he had made no assault upon the accused, and was not in a position to attack them, when the homicidal assault was made.

The recital of the bill is, substantially, that there was testimony before the jury to the effect that the deceased, at the time he was shot,· had his hands behind his back, and called on the defendants to defend themselves; but that no testimony had been introduced by the de- fendants for the purpose of showing that the deceased was actually armed—the contention being that it was immaterial whether he was· armed or not armed; because if the defendant, Sadler, had reasonable grounds to believe, and did believe, that the deceased was about to· draw a weapon to kill him, he had a right to act upon that presump- tion and defend himself.

Upon this alleged condition of affairs, the trial judge very appro- priately said:

"If the deceased had had a weapon on his person, and that fact· "had been proved, it might have given weight to the statement that "he told Sadler 'defend yourself,' and with this declaration, had "thrown his right hand behind him. But, if he were not armed, that "fact would impeach the correctness of the statement.

"The objection went rather to the weight, or sufficiency of the evi- "dence, than to its admissibility."

In our view, that disposition of the objection was entirely correct. We can see no possible objection to the evidence.

## XIII.

Bill number sixteen was disposed of by the court in its general charge; and bill number seventeen relates to the refusal of the judge· to give the following requested special charge, to-wit:

"Where self-defense is relied upon by the defendant in a murder "case, the court should instruct the jury, that the right of self-defense· "does not depend upon real or apparent danger, as it appears to·

"them, but on the danger as it reasonably appeared to the accused at "the time of the killing."

The trial judge stated the following reasons for declining to give the said charge, viz:

"The charge requested is not, strictly, correct. The right of self-"defense does not arise in case of 'danger as it reasonably appeared "to the accused,' but as to a danger apparent to a reasonable man, "and induced by reasonable evidence, from defendants' standpoint."

The court charged the jury: "If a man be mistaken as to his "actual danger, yet, he will not be responsible for his actions in self-"defense, from real and honest convictions of danger, induced by "reasonable evidence. And, in exercising his judgment as to his "danger, and the means adopted to avoid and evade it, the law does "not hold the accused to the same calmness of judgment that a juror "exercises in deliberating over the facts of the case. The jurors "should consider the case as if they were in defendants' place.

\*        \*        \*        \*        \*        \*        \*        \*

"The rule is that the defendant must have really and honestly "believed that his life was in danger, from the character of the as-"sault, although really not in danger; or that his person was in "danger of great bodily harm, though really in no such danger; and "the evidence upon which he based this belief must have been reason-"able, and must have been such as would have induced such belief in "a reasonable person, etc."

We are of opinion that the statement of the judge covers all the reasonable requirements of the defendants, and very fairly states the law of self-defense; and that to have given the special charge as requested, would have been as unnecessary as unavailing.

## XIV.

Bills of exception eighteen, nineteen and twenty, relate to the declination of the trial judge to give to the jury the following special charge, in relation to the law of self-defense, viz:

(1) "In order to excuse a homicide on the ground of self-defense, "it is not necessary that there should be actual and impending "danger. The true test is, whether defendant, at the time of the "fatal act, honestly believed and had reasonable ground to believe, "that he was in immediate danger of loss of life, or of the infliction

" of great bodily·harm, and that he had no other apparent or safe " means of escape."

\*     \*     \*     \*     \*     \*     \*     \*

(2) "Where the accused relies on the plea of self-defense, there is " no greater burden on him to establish that plea, by affirmative evi- " dence, than any other defense; but, if all the evidence raise in the " minds of the jury a reasonable doubt as to whether he acted in self- " defense, he should be acquitted."

\*     \*     \*     \*     \*     \*     \*     \*

(3) "If you find from the evidence, that the accused, Robert Sad- " ler, at the time of the shooting, had reason to apprehend, and did " apprehend and believe that the deceased, Peter Miller, would shoot " or kill him, unless he ran away, or shot Miller first, then, I charge " you, *that the law does not require him to run and be shot,* perhaps " in the back, *or afterwards secretly assassinated,* but *justified his* " *taking Miller's life.*

"And if the accused, Robert Sadler, at the time of the killing, be- " lieved, from the physical demonstration made by Miller, that he was " drawing out a pistol from his pocket to shoot him, and the fact " afterwards develops that Miller, then, had no pistol, but was only " manoeuvreing to make Sadler run, I charge you, that this would not " make Sadler culpable, or guilty, for doing what he had good reason " to believe was necessary for either the immediate or ultimate se- " curity of his life; and, if you so find, you must acquit the accused."

The first of these three special charges is fully covered by the general charge, which is made part of the bill.

To the second, the judge's response is, that "if there is a reasonable " doubt as to defendants' guilt, he should be acquitted; but, if there " is a reasonable doubt as to his having acted in self-defense, it might " justify conviction, etc."

The third and last is objectionable as containing hypothetical state- ments which might mislead the jury; and we are of opinion that the whole subject-matter is more correctly disposed of by the general charge to the jury.

## XV.

Bill number twenty-one is covered by the general charge, and bill number twenty-two relates to another special charge, in reference to the plea of self-defense, which is to the effect that before "a jury can " refuse to allow the defendant the benefit of the plea of self-defense,

" on the ground that he sought, or voluntarily entered into a difficulty
" with the deceased which resulted in the killing, they must believe
" from the evidence, beyond any reasonable doubt, that the defendant,
" at the time he sought, or entered into said fight with the deceased,
" was actuated by an intent to maim, wound, disable, or seriously
" hurt, or kill the said deceased."

The judge correctly declined to give said charge, upon the ground
that it is "not sound law."

"It means, in effect," says the judge, "that before the prisoner's de-
" fense can be rejected, the jury must find that he sought and fought
" the deceased with malicious intent. The failure to prove malice,
" does not, necessarily, make a plea of self-defense good. Man-
" slaughter is an element to be considered in this case."

In our view, there is nothing that needs to be added to the foregoing
just and correct observations.

## XVI.

Separate motions for new trial were filed by counsel for each of the
defendants; and they are quite elaborate, and deal principally with
points raised and discussed in the various bills of exception.

The points chiefly relied upon are, (1), that due diligence had not
been employed by the State to obtain the original summons, which
was issued for the absent witness, McCarthy; (2), that the court ille-
gally declined to permit the introduction of newly-discovered evidence
for the purpose of impeaching the testimony of Buttermore, one of the
State's witnesses; (3), that the section of the court in which the cause
was tried was without jurisdiction.

In so far as the question of diligence of the State in the matter
of the summons of McCarthy is concerned, it was matter to be de-
termined on the trial, and as a basis for the introduction of that indi-
vidual's deposition before the recorder. At that time, the witnesses
were interrogated and their testimony satisfied us that a proper basis
had been laid. There was no question then raised with regard to the
proper diligence having been used in procuring the original sum-
mons. And. in our opinion, that isolated question can have no im-
portant bearing upon the allowance vel non of a new trial.

With regard to the newly discovered evidence tending to impeach
the credibility of one of the State's witnesses, it is claimed that the
witness referred to was one of several witnesses who testified to sub-

stantially the same state of facts, and this testimony was only discovered four months after the trial and conviction of the accused.

On this hypothesis, the testimony of this witness was only cumulative, and in such case, we would feel bound to maintain the ruling of the trial judge, unless strong and exceptional circumstances were stated; and, this has not been done in this instance.

With regard to the want of jurisdiction of the trial court, the proposition of the defendants' counsel is this, viz:

That the complaint first made against the defendant, Charles Campbell, charging him with murder of the deceased, was heard in the First Recorder's Court, and the proceedings and records thereof were sent to Section "A" of the Criminal District Court, to which same was allotted; and that the complaint made against Robert Sadler, also, charging him with the murder of the deceased, was heard in the same recorder's court, and the proceedings and record thereof were sent to Section "B," of the Criminal District Court, to which the same was allotted.

That, subsequently, the grand jury found and returned one true bill against both of the defendants for the murder of the deceased jointly, which was given a new number, and allotted to Section "B" of said court, without any order of court for the re-allottment thereof.

The contention of defendant's counsel is that the allottment of causes in the Criminal District Court is controlled by the provisions of the constitution, and that same were violated.

That may be true, and, yet, not disturb the allottment of this case.

The language of the constitution on this subject is, that "each " judge, or his successor, shall have exclusive control over every *cause* "falling to him from its *inception* to final determination in said " court," etc.

Constitution of 1879, Article 130.   (Our italics.)

What is the inception of a cause in the constitutional sense? Evidently the finding of the bill of indictment and the returning of same into court.

Necessarily so in this case, as the two defendants who were separately arrested under preliminary proceedings, were by the grand jury jointly indicted.

The finding of the indictment, necessarily abated and merged the preliminary proceedings into the *cause*, or prosecution; and no further action thereupon could be entertained.

It seems perfectly clear, that the only thing that could have been. done, was just what was done, the docketing of the cause under a new number, and allotting same as a new one.

We are of opinion that the new trial was properly refused.

A most careful and attentive examination of this record has satisfied us that no error has been committed to the prejudice of the accused.

Judgment affirmed.

MR. JUSTICE MONROE not having been a member of the court when. this cause was submitted, takes no part in this opinion.

ON APPLICATION FOR REHEARING.

BLANCHARD, J.  On the night of December 31, 1897, Peter Miller was shot and mortally wounded. He was conveyed to the Charity Hospital and died there three days later.  Subsequent to the shooting on the night of December 31st, he was visited by Police Captain Journee, whose object was to acquire information relative to the shooting, who did it, etc., the better to enable him to discharge his duty as an officer of the law in the discovery and apprehension of the guilty parties.

Miller at that time believed himself to be in a dying condition and the statements then and there made by him to Journee were, on the trial, admitted as evidence to the jury on the ground that the same were dying declarations.

This was stoutly resisted by counsel for the accused, who contended the proof was not sufficient to establish that Miller made the statements under the sense of impending dissolution, and to the adverse ruling of the trial judge, reserved a bill of exceptions.

This ruling we held, in the previous opinion handed down, to be correct and now reaffirm the same.

The accused had not then been arrested, were not in custody and were not present at that meeting between the deceased and Journee.

The next day, January 1, 1898, they were arrested and on the night of that day were, while in custody, conveyed to the Charity Hospital by Captain Journee and one other police officer.  Arriving there Captain Journee requested permission of the surgeon in charge to see Miller, the wounded man, in order that he (Miller) might, if possible, identify the two prisoners in custody as his assailants.

Permission being given, a Sister of Charity aroused Miller, and Journee approached the bed with the accused and the officer. Leaving the accused near the head of the bed and as yet out of sight of Miller, Journee, with whom Miller was acquainted, drew near the latter, spoke to him and cautioning him to be quiet and careful, told him in substance he had brought two parties for the purpose of having him (Miller) say whether or not they were the parties who had shot him. He then caused Sadler, one of the accused, to come to the bedside, whereupon Miller said: "That is the man, Chapman; your name is not Sadler, but Chapman. You are the man who shot me."

Journee then caused Campbell, the other accused, to come forward, whereupon Miller said: "You, Campbell, had a pistol in your hand also."

Following this identification Captain Journee made or caused to be made an affidavit, charging the two accused with the crime, and under a warrant based on this affidavit they were remanded to prison.

At the trial, Journee and the officer, who had been with him at the hospital on the occasion referred to, were placed on the stand as witnesses for the prosecution to prove what took place at that time, including the declarations made by Miller, the deceased.

Over the objection of counsel for the accused the testimony was permitted to go to the jury, and a bill was reserved to the ruling of the Judge.

This evidence was offered by the State to prove identification.

It was objected to by the accused on the ground that at the time referred to they were under arrest and restraint in the custody of the officers of the law; that the statement of the accused offered to be proven was not part of the *res gestae,* and inadmissible because there was nothing to show, nor any pretense, that the same was a dying declaration; that the accused were not told they had the right to deny the charge of the deceased and did not know they were at liberty to speak; that by the admission of this testimony defendant Sadler was forced to go upon the stand as a witness to testify concerning it in contradiction of the police officers, greatly to his prejudice, and in violation of his right as a defendant not to testify as a witness upon any but such matters as he saw fit.

The former opinion of the court held these objections untenable because it was considered that the statements of the wounded man *then* made were admissible as dying declarations.

90

State vs. Sadler et al.

A re-examination of the case in respect to the same (bill of exceptions Nos. 4 and 5), has had the effect of changing the view then entertained.

There is nothing whatever to show that the statements made by Miller on the night of Jan. 1, 1898, were made under the sense of impending dissolution.

He said nothing at the time to indicate he believed he was dying, or was about to die, or was going to die. He was awakened from slumber, confronted with the accused, identified them as his assailants, declared one of them had shot him and the other was present assisting by having a pistol in his hand.

No foundation for this statement of his as a dying declaration was made, and it was not offered or received as such.

The statements of the deceased the preceding night, that of the shooting, December 31, to Officer Journee were properly admitted in evidence as dying declarations. A foundation for the same as dying declarations was laid. Miller then stated in effect that he believed he was going to die, and, following this, he made the declarations which were offered and received as dying declarations.

But this was twenty-four hours previous to the second interview Journee had with him, and it might well be at the time of the second interview Miller did not believe he was going to die and did not say what he then said under the sanctity arising from the sense of impending dissolution. If he did it should have been established as the basis for the introduction of the evidence.

Otherwise it was not admissible.

The case of State vs. Diskin, 34 La. Ann. 919, and that of State vs Robinson, 51 La. Ann., 694, are practically identical with this one, and on their authority there must needs be a reversal of the verdict and sentence and a remanding of the case.

The statement made by Miller on the night of the 31st of December, which we think was properly admitted as a dying declaration, was not the same he made on the night of Jany.1st, which we hold to be inadmissible because *not* made as a dying declaration.

In the first, his statement was that Sadler had shot him and that Campbell was in his company at the time. In the second, his statement was to the effect, referring to Sadler: "That is the man, Chapman. Your name is not *Sadler*, but Chapman. You are the man

who shot me"; and referring to Campbell: "You, Campbell, had a pistol in your hand also."

The first statement was made outside of the presence of the accused, and the objection to its admissibility was that the proper foundation for it as a dying declaration had not been laid.

His second statement was made while the accused were present and under *arrest,* and was offered and admitted to identify them. It was not a dying declaration. No foundation was laid, or attempted, showing the deceased to have been in the same condition of mind he was when twenty-four hours before he made what was received as a dying declaration.

There is no presumption that because a man believes, shortly after he is shot, he is going to die as the immediate consequence of his wounds, that 24 hours later he continues in this belief.

In Carver vs. United States, 160 U. S. 553, the deceased woman who had been shot and mortally wounded made two statements. The first was held to have been properly admitted in evidence because it had been satisfactorily established that when the victim made it she was under the impression of almost immediate dissolution. The second was held to have been improperly admitted because it did not appear whether at the time, when the later statement was made, she spoke under the admonition of her approaching end.

The statements of Miller, made at the later interview, if not coming within the category of dying declarations, were hearsay and should not have been permitted to go to the jury.

It was incumbent upon the State to lay the foundation for their admission as dying declarations. Defendants could rely upon the presumption of innocence and were not compelled to show that the deceased then believed he might recover.

Neither were the statements of the deceased on the night of January 1st admissible as a confession of guilt on part of the prisoners, to be inferred from their silence on the occasion. The silence of one under arrest on a criminal charge to statements made in his presence or hearing cannot have that effect. State vs. Diskin, 34 La. Ann. 922.

The prisoner Sadler had always claimed his name was *Sadler;* denied that it was Chapman; and the killing of Miller was caused by the latter's assertion to the fiancee of Sadler that he (Sadler) was not named "Sadler," but *Chapman,* and that his father was a negro. In view of this, Miller's statement on the night of January 1st, when

Sadler was brought before him, that his name was not Sadler but Chapman, was of material consequence. Hence, it is apparent that as Miller did not use these or similar words at the interview Captain Journee had with him the preceding night, it cannot be claimed that the interview on the night of January 1st is unobjectionable as being merely *cumulative*—the repetition of what was said the previous night.

Furthermore, the statement to Sadler "your name is Chapman, etc.," was not admissible even as a dying declaration because it was an opinion and no part of the *res gestae*. Underhill Crim. Ev. p. 137; Bradner on Ev. p. 454.

For these reasons, it is ordered that the former decree of the court herein be set aside, and it is now ordered, adjudged and decreed that the verdict and sentence appealed from be annulled, avoided and reversed, and that this case be remanded to the court *a qua* to be proceeded with according to law—the accused to remain in the custody of the law.

MONROE, J., takes no part.