hKOSTELKA, J.
The juvenile, D.P.B., was adjudicated delinquent for the crime of manslaughter, La. R.S. 14:31. He now appeals contending that the state failed to prove beyond a reasonable doubt that the homicide was not justified. Finding merit to his claim, we reverse the adjudication and disposition.[1]
Facts
On the evening of October 3, 2000, D.P.B. and his friends, C.H., E.U. and P.R., got together in P.R.’s Mustang and rode around West Monroe and Monroe, Louisiana. D.P.B. and P.R. were best friends. C.H. was designated driver for the evening and D.P.B. and P.R. rode in the back seat. Both D.P.B. and P.R. drank alcohol during the evening, but, as was his custom, P.R. drank heavily.
Sometime during the evening, P.R. and D.P.B. got into a fight when P.R. began leaning on D.P.B. in the back seat of the car. The verbal altercation became physical as the two boys began to push, kick, hit and curse at each other. P.R. and D.P.B. had a history of this wrestling-type fighting but would readily reconcile the following day.
At approximately 1:00 a.m., the young men decided to call it a night. They first dropped D.P.B. off at the home he shared with his father and brother. Thereafter, C.H. and E.U. drove P.R. to his house. P.R. was heavily intoxicated and refused to get out of the car. Eventually C.H. and E.U. went to C.H.’s house, leaving P.R. in his car. At approximately 2:04 a.m., P.R. called D.P.B. The two engaged in a short and evidently heated | ¡>,exchange until D.P.B. hung up the phone. Á few minutes later P.R. drove up to D.P.B.’s home. Upon realizing it was P.R., D.P.B. went from his bedroom to the living room where he observed P.R. enter through the unlocked carport door which led into the kitchen of the home. D.P.B. told P.R. to get out of the house or he would shoot. D.P.B. claimed P.R. told him to do what he had to do. Thereafter, D.P.B. retreived a .30-30 hunting rifle from the fireplace mantle of the living room and was able to load two rounds of ammunition into the gun before P.R. reached him. D.P.B. claimed that P.R. grabbed the barrel of the gun and the two struggled as they traveled approximately thirteen feet, ten inches into a hallway leading to the front door of the house. D.P.B. claimed that during the struggle he called for his father who was asleep in the house. In the hallway, the gun discharged striking P.R. in the lower abdomen. The contact wound fatally injured P.R.
*1197 Discussion
On appeal, D.P.B. argues that the evidence was insufficient to prove the killing of P.R. was not accidental or a justified homicide. He also urges that the imposed disposition is excessive.
In a juvenile delinquency proceeding, the state’s burden of proof is the same as in a criminal proceeding against an adult — to prove beyond a reasonable doubt every element of the offense alleged in the petition. La. Ch.C. art. 883. In a juvenile case, the reviewing court is constitutionally compelled to review both facts and law. La. Const. art. 5, § 10(A) and (B). However, the reviewing court must recognize that the juvenile judge observed the conduct and demeanor of the witnesses and was in the best [.-¡position to determine credibility and weigh the evidence. Therefore, this court grants great deference to the juvenile court’s factual findings and credibility determinations and assessment of the weight of particular testimony. State v. S.B., 31,264 (La.App.2d Cir.09/25/98), 719 So.2d 1121. Not only does the standard of review in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) apply to juvenile delinquency adjudicatory hearings, but our state constitution mandates that we determine, after reviewing the record evidence, whether the juvenile court was clearly wrong in its fact-findings. State v. Redd, 445 So.2d 126 (La.App. 2d Cir.1984). See discussion, State in Interest of Cason, 438 So.2d 1130 (La.App. 2d Cir.1983).
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of the evidence in such eases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App.2d Cir.09/25/98), 719 So.2d 610, writ denied, 98-2723 (La.02/05/99), 737 So.2d 747.
When circumstantial evidence forms the basis for the conviction, such evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. The court does not determine whether another possible | ¿hypothesis suggested by a defendant could afford an exculpatory explanation of the events; rather, when evaluating the evidence in the light most favorable to the prosecution, the court determines whether the possible alternative hypothesis is sufficiently reasonable that a rational fact-finder could not have found proof of guilt beyond a reasonable doubt under Jackson.
When a defendant asserts justification as a defense to murder, the state bears the burden of proving beyond a reasonable doubt that the killing was not justified. State v. Matthews, 464 So.2d 298 (La.1985). On appeal, that applicable standard is whether a rational fact-finder, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the homicide was not committed in self-defense. Id.

Justifiable Homicide

La. R.S. 14:20(4) provides that a homicide is justifiable when committed by a person lawfully inside a dwelling against a person who has made an unlawful entry into the dwelling and the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the premises. We find that the *1198 facts of this case fit squarely within this provision.
The evidence presented by the state was largely circumstantial. This evidence included D.P.B.’s taped statement which contained his version of the shooting events. Therein, he stated that on the day of the incident, he and P.R. picked up C.H. and E.U. and the group rode around to various places. On the way home, D.P.B. and P.R. got into a physical fight in the Rear. D.P.B. went home and P.R. called him. The two exchanged approximately five words and D.P.B. hung up the phone. From his bedroom, D.P.B. heard P.R. pull up into the driveway about eight minutes later. He ran to the living room and by that time P.R. had opened the door to the carport. D.P.B. retrieved a gun and put two shells in it. By that time P.R. was “up there” and grabbed the barrel. The two started wrestling and D.P.B. cocked the gun and called for his father. During the scuffle, D.P.B.’s finger was on the trigger and the gun went off. D.P.B.’s father came out of his room and told him to call 911. D.P.B. made the call but his father talked to police. D.P.B. went into his room to get dressed.
C.H. and E.U. testified. They each saw D.P.B. and P.R. fighting that night in the back seat of the car. They confirmed that D.P.B. and P.R. were best friends. E.U. stated the fight started because P.R. laid his head on D.P.B. The fight included wrestling, pushing and cursing. Both witnesses confirmed that P.R. was drunk and that they had seen the two fight before. Although the fighting usually entailed wrestling, cursing and arguing, the two would be friends the next day. The fight that night was no different. C.H. remembered that P.R. took the last swing at D.P.B. and after they had dropped D.P.B. off, P.R. stated that he “ought to go down there and whip his ass” C.H. admitted that in his statement to police, he indicated that D.P.B. threatened to kill P.R., but he did not recall such a statement at the time of trial. E.U. testified that D.P.B. threatened to kill P.R. during their fight and that D.P.B. indicated he was not afraid to go to jail for murder. E.U. did not believe D.P.B. meant it. E.U. also stated that P.R. indicated his intent to go to D.P.B.’s house and fight him.
| fiOfficer Gary Mercer (“Mercer”) responded to the shooting. He testified that D.P.B. indicated to him that he had shot P.R. and that he, P.R., was trying to start a fight. D.P.B. also stated to Mercer that he told P.R. to stop and that if he did not, he would shoot him.
Dr. John Price, the general surgeon who performed surgery on P.R., testified that the gunshot wound was a contact wound and that the gun was either on the skin or one or two inches away. He believed the victim was within barrel reach of D.P.B.
Officer Vince Guiterez (“Guiterez”) of the Monroe Police Department was the first to arrive at the scene. D.P.B. also informed the officer he had shot P.R. While transporting D.P.B. to the police station, Guiterez remembered D.P.B. stating that “he’d shoot the [m- — f—] again” and asked how fast the car would go. Guiterez testified that D.P.B. never indicated he was afraid, was not remorseful and was belligerent. Guiterez also testified that D.P.B. told him of the earlier fight with P.R. and stated that he “beat the [m — f—] ass-” Guiterez observed P.R. was shot once in the stomach.
Detective Mark Nappier (“Nappier”) of the Monroe Police Department entered the house after P.R. and D.P.B. were gone. He observed no signs of a struggle except the pools of blood on the floor and a broken picture frame in the hall near where the victim fell. Nappier noticed nothing out of place or anything knocked off of the desk in the living room where the alleged struggle ensued. The house *1199 was cluttered. Nappier indicated that P.R. was shot from the front and was not retreating and that D.P.B.’s back was apparently to the front door. Nappier opined that the two [ 7boys were physically about the same size. Nappier also testified that D.P.B. admitted beating P.R.’s “ass” earlier that evening and that D.P.B. never indicated he had any fear of P.R.
Sergeant Jeff Harris testified he could lift no fingerprints from the gun.
D.P.B.’s father, C.B., testified. He indicated he was awakened by D.B.’s calls to him for help. He heard the gunshot before he got to his bedroom door. As he opened the door, he saw P.R. leaning over in the hallway. D.P.B had fallen back against the front door. C.B. told D.P.B. to call 911. C.B. saw a fan knocked over and picked it up. He also took the weapon into his room. C.B. also testified that P.R. was not permitted in the home.
From the overall evidence presented, a rational fact-finder might have reasonably concluded that D.P.B. could not have believed the use of deadly force was necessary to compel his best friend to leave the home. Although C.B.’s testimony is adequate to show that P.R.’s entry into the house was unauthorized, the parties’ fighting history failed to indicate that their altercations were any more than wrestling matches which ended up with D.P.B. and P.R. remaining friends. In these circumstances, it would have been rational to conclude that despite P.R.’s unauthorized entry into the home, D.P.B. could not have reasonably believed that this fight would have been any different than before and that deadly force was not a necessary choice. Certainly, too, the evidence suggests that it was D.P.B. who had earlier threatened to kill P.R. D.P.B.’s lack of remorse and claims that he had beaten P.R. earlier in the evening certainly intimated a lack of fear on |shis part. This lack of fear is further supported by the questionable evidence of whether a struggle took place. Finally, the fact that D.P.B. could have locked the door or awakened his father at a time prior to P.R.’s entrance into the house is a factor that weighs in favor of the conclusion that D.P.B. could not reasonably believe the use of deadly force was necessary. See, State v. Hudson, 33,357 (La.App.2d Cir.05/10/00), 760 So.2d 591, and cases cited therein.
Nevertheless, both the physical evidence and testimony relating to the events which transpired after P.R. entered the home are consistent with D.P.B.’s self-defense claim. It cannot be disputed that upon P.R.’s unauthorized entry into the home, D.P.B. requested that he leave and announced his intent to shoot. With that information, P.R. chose to enter the home with an obvious lack of concern for D.P.B.’s threats and in a possible drunken rage. Thereafter, the physical evidence shows that the two young men traveled a distance of thirteen feet, ten inches across the room. C.B.’s testimony showing the position of the boys as he exited his room, the physical evidence demonstrating the close proximity between P.R. and D.P.B., as indicated by the contact wound, and the location of P.R.’s gunshot wound are affirmative evidence- that P.R. was in an aggressive posture as the two moved. This evidence simply fails to rule out as unreasonable the theory that on this night, P.R., in a drunken belligerent state, chose to elevate the youths’ fighting history from wrestling to a life-threatening altercation when he entered D.P.B.’s home without authorization, refused to leave after being requested to do so, and thereafter aggressively pursued D.P.B. These circumstances are consistent with the ^possibility that during the events which transpired, such overt acts or hostile demonstrations created in the mind of D.P.B. a reasonable belief that the use of deadly force was necessary. Certainly, D.P.B.’s cries to his *1200 father are consistent with this hypothesis. Of course, the standard for justification is not the ultimate reality of the danger, but the reasonable belief of the individual at the time. State v. McCrory, 146 La. 15, 83 So. 361 (1919); State v. Sadler, 51 La. Ann. 1397, 26 So. 390 (1899). Under this standard, even the absence of a struggle does not negate the rational possibility that D.P.B. believed his life to be in danger.
Thus, when viewing the evidence in the light most favorable to the state, we find that the state failed to eliminate, beyond a reasonable doubt, the rational theory that D.P.B. believed deadly force was necessary to compel P.R. to leave his home. Accordingly, we conclude that a reasonable doubt exists as to whether or not D.P.B.’s actions qualified as justifiable homicide under these circumstances. As noted by the Louisiana Supreme Court in State v. Savoy, 418 So.2d 547 (La.1982), “[N]o one except the defendant will ever know to a moral certainty the truth as to what happened” in the morning hours of October 4, 2000.
In light of this determination, we preter-mit discussion of D.P.B.’s remaining arguments regarding proof that the shooting was accidental, the application of La. R.S. 14:20(3) to these facts and the excessiveness of the disposition. D.P.B.’s adjudication and disposition are reversed.
ADJUDICATION AND DISPOSITION REVERSED.
APPLICATION FOR REHEARING
Before WILLIAMS, STEWART, GASKINS, PEATROSS, and KOSTELKA, JJ.
Rehearing denied.
PEATROSS, J., would grant rehearing.

. The trial court ordered the custody of D.P.B. continued in the State Department of Corrections until his twenty-first birthday but suspended all but two years to be served in a secure setting.